IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JESSICA PEARCE, | : Civil No. 1:23-CV-1175 |
| | : |
| Plaintiff, | : |
| | : (Chief Judge Brann) |
| v. | : |
| | : |
| MARTIN O'MALLEY, | : (Chief Magistrate Judge Bloom) |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

## REPORT AND RECOMMENDATION

## I. Introduction

Jessica Pearce filed an application for disability and disability insurance benefits, as well as supplemental security income, on February 25, 2020. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Pearce was not disabled from her alleged onset date of December 3, 2018, through the date of the ALJ's decision, September 22, 2022.

Pearce now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, we recommend that the district court affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

Jessica Pearce filed for disability and disability insurance benefits, as well as supplemental security income, alleging disability due to degenerative disc disease, chronic pain syndrome, hypertension, and anxiety. (Tr. 103). She alleged an onset date of disability of December 3, 2018. (*Id.*). Pearce was 40 years old at the time of her alleged onset of disability, had a limited education, and had past relevant work as a dispatcher. (Tr. 26, 103).

The medical record regarding Pearce's impairments revealed that Pearce had a history of anxiety. Prior to the alleged onset of disability, Pearce underwent a psychiatric evaluation at The Stevens Center in August of 2017, at which time it was noted that Pearce had a history of trauma. (Tr. 517). She was diagnosed with post-traumatic stress disorder and anxiety and was prescribed medication. (Tr. 521). A psychiatric

progress note from October of 2017 revealed that Pearce's mental status examination was largely unremarkable, although she exhibited an irritable affect and fair insight, judgment, and concentration. (Tr. 499-500). Although she reported experiencing panic attacks around this time, treatment notes from July of 2018 indicate that Pearce failed to attend her therapy appointments from October of 2017 until July of 2018, and she was discharged from therapy. (Tr. 494).

Around this same time in July of 2018, Pearce reported anxiety to her primary care physician, Dr. Donald Dangle, D.O., at the Family Practice Center. (Tr. 544). Dr. As a result, Dangle increased her medications. (Tr. 545). At a follow up appointment in August, Pearce reported doing well with only occasional panic attacks but complained of neck pain after an incident at work. (Tr. 547). Dr. Dangle noted restricted range of motion in her neck on examination and prescribed a muscle relaxer. (Tr. 548-49). An MRI of Pearce's cervical spine in September revealed mild degenerative disc disease. (Tr. 624). Pearce continued to complain of neck pain in November, including numbness and tingling

into her upper extremities, and Dr. Dangle recommended a trial of physical therapy. (Tr. 553-55).

Dr. Dangle's treatment notes from January of 2019 indicate that Pearce's neck pain somewhat improved when treated with prednisone. (Tr. 556). On examination, Pearce had restricted range of motion but normal strength in her bilateral upper extremities. (Tr. 557). In February, Pearce underwent another MRI of her cervical spine, which revealed small disc bulges and mild to moderate foraminal narrowing. (Tr. 559). Dr. Dangle referred Pearce to pain management. (Tr. 560). Treatment notes from March indicate that Pearce underwent an epidural steroid injection without significant improvement in her pain. (Tr. 561, 675, 866). At a follow up appointment in June, Dr. Dangle noted that a medication change appeared to help with Pearce's cervical pain. (Tr. 564).

In October of 2019, Pearce reported worsening neck pain with intermittent pain radiating into her upper extremities. (Tr. 571). Dr. Dangle noted that previous epidural steroid injections provided some relief, but she was having increased pain. (*Id.*). On examination, Pearce had full strength in her upper extremities. (Tr. 572). Dr. Dangle added

4

new medications to her regimen and recommended following up with pain management. (Tr. 573). At a follow up one month later, Dr. Dangle noted that the increase in medications was working well for Pearce and on examination, she walked with a normal gait. (Tr. 575-76). Because she reported some increased pain at this visit, Dr. Dangle again increased her medications. (Tr. 576).

Pearce began treating with Dr. Amanpreet Sandhu, M.D., at UPMC pain management in January of 2020. (Tr. 923). Pearce reported ongoing neck pain and numbness in her bilateral upper extremities. (*Id.*). At this visit, it was noted that Pearce's psychiatric issues were "fairly well controlled." (*Id.*). A physical examination revealed a somewhat antalgic gait, preserved cervical range of motion, and positive pain with flexion and extension. (Tr. 927). Dr. Sandhu scheduled Pearce for bilateral cervical facet steroid injections. (Tr. 928). However, Pearce reported to Dr. Dangle in March that her neck pain was worsening, and Dr. Dangle added morphine to her medication regimen and referred her to an orthopedic surgeon for a consultation. (Tr. 585-87). At a follow up

appointment in May, Pearce continued to report neck pain as well as anxiety issues. (Tr. 592).

In July of 2020, Dr. Dangle's treatment notes indicated that Pearce was waiting on insurance approval for additional injections for her neck pain. (Tr. 743). His notes also stated that Pearce's "anxiety has continued to be uncontrolled[.]" (*Id.*). Dr. Dangle made changes to her medication regimen. (Tr. 744-45). Around this time, a physical examination performed at the Orthopedic Institute of Pennsylvania ("OIP") revealed slightly decreased cervical range of motion, 5/5 strength in her bilateral upper extremities, and a steady gait. (Tr. 860). It was noted that Pearce was scheduled for additional injections with Dr. Sandhu. (Tr. 861). However, in September, Pearce reported a significant decrease in function ability at a visit with Dr. Dangle. (Tr. 747). Dr. Dangle noted that she was not taking her medications as prescribed and counseled her on compliance with her medication regimen. (*Id.*).

Around this time in September of 2020, Pearce underwent an internal medicine examination with Nurse Practitioner Daniel Chege. (Tr. 723-27). NP Chege's evaluation indicated that Pearce lived alone and

did not need help at home, and that she cooked and performed personal care every day and did household chores once per week. (Tr. 724). On examination, Pearce had a normal gait, walked on her heels and toes without difficulty, could squat fully, and used no assistive device. (Tr. 725). A musculoskeletal examination revealed negative straight leg raise testing bilaterally, 5/5 strength in the upper and lower extremities, and intact hand and finger dexterity with an ability to zip, button, and tie without difficulty. (Tr. 726). NP Chege opined that Pearce could occasionally lift and carry up to 20 pounds; could sit, stand, and walk for 8 hours in an 8-hour workday; could occasionally reach overhead and push and pull; and could frequently perform all other postural activities. (Tr. 728-33).

Pearce continued to complain of neck pain in November of 2020, as well as bilateral pain in her knees. (Tr. 754). Pearce had been prescribed a fentanyl patch for her neck pain, which was not working, and Dr. Dangle ordered X-rays of her bilateral knees. (Tr. 754-55). The X-rays of Pearce's knees showed mild degenerative changes in her left knee and advanced degenerative changes in her right knee. (Tr. 775).

Treatment notes from February of 2021 indicate that Pearce was still experiencing neck pain and pain in her knees, and she also reported a new complaint of right shoulder pain. (Tr. 1022). She was advised to follow up with pain management for her neck and knee pain, and she declined a physical therapy referral for her shoulder. (Tr. 1024-25). An MRI of her right shoulder at this time showed mild acromioclavicular joint degeneration. (Tr. 1155). A second MRI in April of 2021 further revealed mild tendinosis of the infraspinatus tendon, mild degenerative labral fraying, and mild subacromial subdeltoid bursitis. (Tr. 1157). She received a steroid injection for her shoulder pain. (Tr. 1030-31). She also underwent physical therapy in May through July of 2021, which ultimately improved her shoulder pain and range of motion. (Tr. 1322-68). Treatment notes from Dr. Dangle in July noted that Pearce was using a TENS unit, which helped both her shoulder and neck pain. (Tr. 1038). She also received injections for her knee pain at OIP in July, October, and November of 2021. (Tr. 841, 850, 1195-97).

In March of 2022, Pearce reported worsening neck pain and anxiety to Dr. Dangle. (Tr. 1046). However, on examination, Pearce walked with

a normal gait and exhibited 5/5 strength in her bilateral upper extremities. (Tr. 1047). In April, it was noted that Dr. Dangle's request for an updated cervical spine MRI was denied because Pearce had not undergone a recent trial of physical therapy for her pain. (Tr. 1053). Dr. Dangle referred Pearce to a spine specialist for further evaluation for possible surgical options. (Tr. 1054).

Treatment notes from OIP in June indicate that Pearce was still experiencing neck and knee pain. Regarding her knee pain, Pearce received additional injections. (Tr. 1189). With respect to her ongoing neck pain, the treatment notes indicated that conservative treatment was recommended in lieu of surgery at that time. (Tr. 1193-94). An X-ray of her cervical spine at this visit revealed degenerative disc disease and cervicalgia with bilateral upper extremity radiculopathy. (Tr. 1193). Around this time, Pearce began physical therapy for her knee pain. (Tr. 1199). Throughout this treatment, it was noted that taping her knee with kinesiology tape helped her with stability, and she was noted to make good gradual improvements. (Tr. 1303, 1317, 1319).

Dr. Dangle filled out a physical residual functional capacity evaluation for Pearce in July of 2022. (Tr. 1242-45). In his evaluation, Dr. Dangle opined that Pearce's chronic pain interfered with her attention and concentration constantly, and that she needed unscheduled breaks and to shift positions from sitting to standing. (Tr. 1244). He further opined that Pearce could sit for three hours and stand and walk for one hour in an 8-hour workday, and that she had difficulty with prolonged sitting. (*Id.*).

It was against the backdrop of this record that an ALJ held a hearing on Pearce's disability application on September 7, 2022.[1] (Tr. 66-102). Pearce and a Vocational Expert both appeared and testified at this hearing. (*Id.*). Following this hearing, on September 22, 2022, the ALJ issued a decision denying Pearce's application for benefits. (Tr. 12-34). In this decision, the ALJ concluded that Pearce had not engaged in substantial gainful activity since December 3, 2018, her alleged onset of

---

[1] This was the second hearing on Pearce's disability application. The , the first hearing was conducted by a different ALJ on August 30, 2021, prior to the case being assigned to a different ALJ and prior to Pearce obtaining representation. (Tr. 35-65).

disability. (Tr. 18). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Pearce suffered from the following severe impairments: degenerative disc disease of the lumbar and cervical spine; degenerative joint disease of the bilateral knees; chronic obstructive pulmonary disease ("COPD"); bilateral carpal tunnel syndrome; and obesity. (*Id.*). The ALJ further found Pearce's generalized anxiety disorder not to be a severe impairment. (*Id.*). At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 20-22).

Between Steps 3 and 4, the ALJ concluded that Pearce:

[H]a[d] the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except can occasionally climb ramps and stairs, and occasionally balance, stoop, crouch; cannot kneel, crawl, climb ladders, ropes, or scaffolds; occasional overhead reaching the bilateral upper extremities, frequent handling and fingering with the bilateral upper extremities; no concentrated exposure to vibration, unprotected heights, moving machinery parts, fumes, dusts, gases, odors and poor ventilation.

(Tr. 22).

In reaching this residual functional capacity ("RFC") determination, the ALJ considered the objective medical record detailed

above, the medical opinion evidence, and Pearce's reported symptoms. With respect to the medical opinion evidence, the ALJ found Dr. Dangle's July 2022 opinion partially persuasive. (Tr. 25). The ALJ reasoned that Dr. Dangle's lifting and walking limitations were supported by his treatment notes and the overall medical record but found that the limitation that Pearce could sit for only three hours in an 8-hour workday was not supported by the record. (*Id.*). The ALJ indicated that the objective medical evidence did not suggest that Pearce had increased pain with sitting, although the record did indicate that standing, walking, climbing stairs, and bending worsened her pain. (*Id.*). The ALJ also considered the opinion of Nurse Practitioner Chege and found Pearce to be more limited than NP Chege suggested, limiting her to a range of sedentary rather than light work. (*Id.*).

The ALJ further considered the opinions of the state agency consulting sources, who opined that Pearce could perform a range of light work and found these opinions partially persuasive. (Tr. 25). The ALJ reasoned that these opinions were somewhat supported by the record with respect to Pearce's history of chronic pain and carpal tunnel

syndrome. (*Id.*). However, given Pearce's documented history of degenerative joint disease in her knees, the ALJ limited Pearce to a range of sedentary rather than light work and accounted for environmental limitations due to her COPD. (*Id.*).

As for Pearce's symptoms, the ALJ found that Pearce's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the medical evidence. (Tr. 23-24). Pearce testified that she experienced constant pain in her neck and her knees. (Tr. 81). She stated that she received injections for her knees, which helped initially but eventually wore off, and that she used a cane and a knee brace. (Tr. 82-83). She also testified that she was in physical therapy for her knees two times per week. (Tr. 92). She further reported her chronic neck pain that radiated into both arms, as well as pain from carpal tunnel syndrome. (Tr. 84). She testified that she drops things but could use utensils, as well as button and zip clothing. (Tr. 84-85). She reported doing some household chores, including cleaning and making meals, but she could not do laundry. (Tr. 86). She further stated that she suffers from anxiety, which causes her to pass out. (Tr. 79). She

reported that her medications have helped some in this regard, limiting her "black outs" to one time per month. (*Id.*). She testified that her impairments affected her attention and concentration. (Tr. 91-92).

The ALJ found Pearce's testimony to be inconsistent with the objective clinical findings. (Tr. 23-24). The ALJ noted that Pearce's providers did not consider her a surgical candidate; her carpal tunnel syndrome was noted to be asymptomatic; her knee pain was improved with treatment; and her examinations largely showed normal range of motion and good strength. (Tr. 24). The ALJ further recognized that while Pearce testified to using a cane, she frequently reported to her medical visits without it and did not bring it to her consultative examination. (*Id.*). The ALJ also noted that Pearce was able to live alone, care for a pet, and perform personal care and chores, which he found supported the limitation to a range of sedentary work. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Pearce was able to perform her past work as a dispatcher, and further found at Step 5 that Pearce could perform the sedentary occupations of a document preparer, order clerk, or lens inserter. (Tr. 26-27). Accordingly,

the ALJ found that Pearce had not met the stringent standard prescribed for disability benefits and denied her claim. (*Id.*).

This appeal followed. On appeal, Pearce presents two issues—that the ALJ erred in his consideration of Dr. Dangle's medical opinion and in his consideration of Pearce's symptoms. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we recommend that the court affirm the decision of the Commissioner.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the

evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)

16

(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*,

399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work,

considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant

can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the

importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington,* 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in February of 2020 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations

22

established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

**D.** <u>Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms</u>

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations. *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir.2009). Our review of those determinations is deferential. *Id.* However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted). An ALJ should give great weight to a claimant's testimony "only when it is supported by competent medical evidence." *McKean v. Colvin*, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted). As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms. 20 C.F.R.

§§ 404.1529, 416.929; SSR 16–3p. Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms considering the entire administrative record. SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated when considering the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's

symptoms and how they affect his or her ability to work. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### E. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is

"only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

As to Pearce's first contention, we conclude that the ALJ's consideration of Dr. Dangle's opinion is supported by substantial evidence. Pearce contends that the objective evidence supports Dr. Dangle's limitation to sitting only three hours in an 8-hour workday, and points to evidence regarding her neck pain. However, our review of the ALJ's decision indicates that the ALJ considered this evidence regarding Pearce's neck pain, including imaging during the relevant period and Dr. Dangle's treatment notes. (Tr. 23-25). The ALJ reasoned that this evidence supported Pearce's allegations of pain and limited her to a range of sedentary work. However, the ALJ found that the medical record did not contain any findings that Pearce's pain was worsened by prolonged sitting and determined that Dr. Dangle's opinion in this respect was not supported by his own treatment notes and the overall medical record. (Tr. 25). Instead, the ALJ found that the medical record supported a

limitation to a range of sedentary work with additional limitations to account for Pearce's chronic pain.

Although there are abnormal findings during the relevant period, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154. Here, the ALJ evaluated Dr. Dangle's opinion in light of the entire medical record, including the additional medical opinion evidence, and found his opinion partially persuasive but failed to adopt the sitting limitation. The ALJ explained his reasoning for the persuasiveness afforded to this medical opinion. *See Burnett*, 220 F.3d at 119. This is all that is required of the ALJ, and we conclude that substantial evidence supports the assessment of the opinion evidence in this case.

We similarly conclude that substantial evidence supports the ALJ's consideration of Pearce's subjective symptoms. Pearce contends that the ALJ's reliance on her activities of daily living, as well as certain progress notes, was error. The ALJ recounted the medical evidence, which included both abnormal and objectively unremarkable physical findings

during the relevant period. He discussed these objective findings, coupled with Pearce's activities of daily living, her testimony, and the fact that she improved with treatment. The ALJ ultimately determined that Pearce was not as limited as she alleged and that she could perform a range of sedentary work.

Given the objective evidence in the record undermining the plaintiff's allegations regarding the severity of her impairments, the ALJ properly considered Pearce's symptoms but ultimately found that she was not as limited as she alleged. Thus, there is no basis for a remand on these grounds. Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case and recommend that this decision be affirmed.

## IV.  <u>Recommendation</u>

For the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner in this case should be affirmed, and the plaintiff's appeal denied.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 19th day of September 2024.

_s/ Daryl F. Bloom_
Daryl F. Bloom
Chief United States Magistrate Judge

31